**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

| | |
|---|---|
| THE UNITED STATES LIFE INSURANCE COMPANY IN THE CITY OF NEW YORK : : : | |
| Plaintiff, : : | |
| v. : : | Civ. Action No. 14-0113 (FLW) |
| ABRAHAM HOLTZMAN, and STATE OF NEW JERSEY, DEPARTMENT OF HUMAN SERVICES, DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES : : : : : | **OPINION** |
| Defendant. : | |

_____:

**<u>WOLFSON, District Judge</u>**:

This interpleader action, filed by Plaintiff United States Life Insurance Company in the City of New York ("Plaintiff" or "U.S. Life"), arises out of competing medical insurance claims between *pro se* defendant Abraham Holtzman ("Holtzman") and defendant Division of Medical Assistance and Health Services ("DMAHS"), which entity administers New Jersey's Medicaid Program. On October 14, 2014, Plaintiff's request for interpleader relief was granted, and in turn, Plaintiff was directed to deposit $109,430.76 of Holtzman's policy proceeds into the Court's registry. After awarding Plaintiff attorney's fees and costs in the amount of $10,532.38, the remaining funds in the registry total $98,898.38. Presently before the Court is DMAHS's motion for judgment on the pleadings, whereby DMAHS argues that it is entitled to the deposited funds. Holtzman opposes the motion and moves, once again, for reconsideration of the Court's April 8 Order denying his request to stay the case. For the following reasons set forth below, DMAHS's motion for judgment on the pleadings is **GRANTED**, and Holtzman's request for reconsideration is **DENIED**.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In 1996, Holtzman applied to the New York State United Teachers Catastrophe Major Medical Insurance Plan for coverage on behalf of himself and his dependent parents, Jacob Holtzman ("Jacob") and Zipora Holtzman ("Zipora"). Pl.'s Compl. ¶ 6. Shortly after, U.S. Life issued a Certificate of Insurance for the group policy E-170, 129 provided by the policyholder, the New York State United Teachers Benefit Trust ("Group Policy"), *id.* at ¶ 7, to cover Holtzman, Jacob, and Zipora. *Id.*

Under the Group Policy, an insured party is entitled to major medical benefits to be paid each benefit period, after the cash deductible is satisfied. *See id.* at ¶¶ 8-9. The cash deductible is the amount of covered expenses that each insured party must incur before U.S. Life pays any benefits. *See id.* For each person, the cash deductible for an accumulation period, which is thirty-six consecutive months, is the greater of the benefits of the basic plan or $25,000.00. Importantly, the Group Policy provides an insured party with care in a convalescent home or custodial care facility in the amount of $500.00 per week for up to 156 weeks in a benefit period. *Id.* However, the Group Policy imposes a lifetime maximum of $80,000.00 for this particular benefit. *Id.*

Starting in 2002, both Jacob and Zipora required admittance to Bergen Regional Medical Center ("Bergen Medical"), a custodial care facility. *See id.* at ¶¶ 11-12. Jacob received custodial care at Bergen Medical from June 5, 2002 to April 24, 2004. *Id.* at ¶ 11. Zipora also received custodial care at Bergen Medical from December 1, 2002 to April 25, 2005. *Id.* at ¶¶ 12-13. On February 1, 2004, Holtzman filed claims with Marsh Affinity Group Services ("Marsh"), the administrator of the Group Policy." *Id.* at ¶ 14. A couple of months later, Marsh sent a letter to Holtzman indicating that the benefits exceeded the $25,000.00 cash deductible. *Id.* at ¶ 15. Ten

days later, Marsh sent a letter to Bergen Medical to inform the facility that Holtzman submitted expenses for consideration of benefits under the Group Policy. *Id*. at ¶ 16.

After approximately three years, Marsh sent a letter to Holtzman on August 15, 2007. In the letter, Marsh indicated to Holtzman that Medicaid is intended to be the payor of last resort. *Id*. at ¶ 17. Marsh told Holtzman that Medicaid recipients are required to assign to the state any rights to payment for medical care from any legally liable third party payor. *Id*. Marsh further explained that Medicaid has a legal obligation to pursue Holtzman's health plan, as the plan was obligated to honor any benefits assigned to Medicaid. *Id*. On May 5, 2008, Marsh notified Holtzman that Medicaid made payments for both Jacob and Zipora during their stays at Bergen Medical; and thus, the Group Policy should have paid for the visitations prior to payments made by Medicaid. *Id*. at ¶¶ 19-20. On June 3, 2008, Holtzman faxed a letter to Marsh stating that, in his view, U.S. Life is not a legally liable third party payor to Medicaid, and he requested that U.S. Life make payments on all past and future claims to Holtzman. *Id*. at ¶ 21.

On June 13, 2008, Medicaid requested reimbursement from U.S. Life for both Jacob and Zipora. *See id*. at ¶¶ 22-23. For Jacob, Medicaid requested reimbursement in the amount of $139,064.58 as Jacob was a Medicaid recipient from March 1, 2002 to April 24, 2004. *Id*. at ¶ 22. For Zipora, Medicaid requested reimbursement in the amount of $180,507.46 since Zipora was a Medicaid recipient from November 1, 2002 to April 25, 2005. *Id*. at ¶ 23. Approximately one month later, U.S. Life informed Holtzman that it was obligated to reimburse Medicaid; however, U.S. Life informed Holtzman that he could appeal the decision within 180 days of the receipt of the letter. *Id*. at ¶ 24. On October 1, 2008, Holtzman notified U.S. Life of his formal appeal. *Id*. at ¶ 29. After unsuccessful negotiations, U.S. Life informed Holtzman that it owed $46,929.51 in

benefits for Jacob, and $62,501.25 in benefits for Zipora to be paid to Medicaid as reimbursement. *See id*. at ¶¶ 32-33. As such, the disputed funds in this case total $109,430.76.

Due to the competing claims by Holtzman and DMAHS, U.S. Life filed the instant suit for interpleader relief. In its Interpleader Complaint, U.S. life explained that there were "multiple and conflicting claims to the benefits under the Group Policy" and "U.S. Life has been unable to discharge its admitted liability without exposing itself to multiple liability or multiple litigation or both." *Id*. at ¶¶ 34-37.  Based on its claims, U.S. life requested, *inter alia*, the following relief:

> . . .
>
> (b)     That the Defendant/Claimants, and each of them, be required to make full and complete answer to this Complaint for Interpleader Relief and to set forth to which of them the benefits, or any part thereof, rightfully belong, and how they make their claims hereto
>
> (c)     That this Court determine and declare the rights of the Defendants/Claimants, and each of them, to the benefits due and owning under the Group Policy[.]
>
> . . .

*Id*. at (b-c). Plaintiff's request for interpleader relief was granted by this Court on October 14, 2014. Thereafter, Plaintiff deposited $109,430.76, pursuant to this Court's order, into the Court's registry. Since U.S. life was awarded $10,532.38 in attorney's fees and costs, $98,898.38 remains in the registry. Subsequently, DMAHS filed an answer in response to U.S. Life's Interpleader Complaint, in which it asserts that "Plaintiff reimburse the [DMAHS] pursuant to *N.J.S.A*. 30:4D-2, *N.J.S.A*. 30:4D-7k and 42 *U.S.C.A*. § 1396a(a)(25) and under the terms of the insurance policy." Def.'s Answer ¶ (A). Now, to collect on the disputed funds, DMAHS moves for judgment on the pleadings. In response, Holtzman opposes the motion, and argues that the question of whether DMAHS is entitled to reimbursement is premature, as there are numerous issues of material fact

in dispute. Holtzman also, for a second time, requests that the Court reconsider its April 8 Order denying Holtzman's request to stay the case.

## II.     ANALYSIS[1]

"Medicaid is a medical assistance program for eligible low-income individuals, established by Subchapter XIX of the federal Social Security Act, 42 *U.S.C.* §§ 1396a-1396u." *Waldman v. Candia*, 317 N.J. Super. 464, 470 (App. Div. 1999). "The program is jointly administered by the federal and [participating] state governments," as state participation in the Medicaid program is not obligatory. *Harris v. McRae*, 448 U.S. 297, 301 (1980); *Waldman*, 317 N.J. Super. at 470. However, while Medicaid gives participating "state governments broad discretion to determine the extent of medical assistance provided," a state that elects to participate in the Medicaid program must submit a "plan" for approval by the Secretary of the United States Department of Health and Human Services. 42 *U.S.C.* § 1396a(b); *Waldman*, 317 N.J. Super. at 470 (citing 42 *U.S.C.* § 1396a(a); *Schweiker v. Gray Panthers*, 453 U.S. 34, 37 (1981)). In part, a state's plan must "describe[e] the nature and scope of its Medicaid program and giv[e] assurance that it will be administered in conformity with the specific requirements of Title XIX, the regulations [contained within Chapter IV of 42 *C.F.R.* 430.10], and other applicable official issuances of the Department [of Health and Human Services]." More specifically, such requirements mandate that the plan provide as follows:

> (A)  that the State or local agency administering [the State plan] will take all reasonable measures to ascertain the legal liability of third parties (including health insurers, self-insured plans, group health plans . . . service benefit plans, managed care organizations, pharmacy benefit managers, or other parties that are, by statute, contract, or agreement, legally responsible for payment of a claim for a health care item or service) to pay for care and services available under the plan . . . .

---

[1]     The Court notes that Holtzman's opposition to DMAHS's motion is handwritten, thereby making some sections of Holtzman's submission difficult to decipher.

. . . .

> (B)  that in any case where such a legal liability is found to exist after medical assistance has been made available on behalf of the individual and where the amount of reimbursement the State can reasonably expect to recover exceeds the costs of such recovery, the State or local agency will seek reimbursement for such assistance to the extent of such legal liability[].

42 *U.S.C.* § 1396a(a)(25)(A), (B). Thus, a state that elects to participate in Medicaid is statutorily obligated to recover medical assistance from liable third parties for the payments made to a Medicaid beneficiary for care arising from injury, disease, or disability. In that connection, a recipient of Medicaid is required to, "as a condition of eligibility, [] assign to the state any rights to support for the purpose of medical care and any rights to payment for medical care from any third party, 42 *U.S.C.* § 1396a(a)(45)." *Waldman*, 317 N.J. Super. at 470.

New Jersey participates in Medicaid pursuant to the New Jersey Medical Assistance and Health Services Act. *N.J.S.A.* 30:4D-1. In accordance with 42 *U.S.C.* § 1396a(a) (5), the Department of Human Services, through the Division of Medical Assistance and Health Services, was designated to administer New Jersey's medical assistance program. *Estate of DeMartino v. Division of Medical Assistance and Health Services*, 373 N.J. Super. 210, 217 (App. Div. 2004) (citing *N.J.S.A.* 30:4D-4 *and N.J.S.A.* 30:4D-5.). New Jersey's plan, as evidenced by the expressed intent of the New Jersey Legislature, demonstrates that it was designed for needy individuals:

> It is the intent of the Legislature to make statutory provision which will enable the State of New Jersey to provide medical assistance, insofar as practicable, *on behalf of persons whose resources are determined to be inadequate to enable them to secure quality medical care at their own expense* . . . . It is further the intent of the Legislature that *benefits provided hereunder shall be last resource benefits* notwithstanding any provisions contained in contracts, wills, agreements or other instruments.

*N.J.S.A.* 30:4D-2 (emphasis added). Hence, the DMAHS must be fiscally responsible in the administration of New Jersey's medical assistance program, as it is reserved for those who cannot

afford quality medical care. In achieving that end, and in furtherance of the aforementioned federal

mandate, the DMAHS is statutorily obligated to take the following action:

> . . . ascertain the legal or equitable liability of third parties to pay for care and
> services (available under the plan) arising out of injury, disease, or disability; where
> it is known that a third party has a liability, to treat such liability as a resource of
> the individual on whose behalf the care and services are made available for
> purposes of determining eligibility; and in any case where such a liability is found
> to exist after medical assistance has been made available on behalf of the individual,
> to seek reimbursement for such assistance to the extent of such liability.

*N.J.S.A.* 30:4D-7(k). Accordingly, New Jersey's medical assistance program reflects the federal

requirements, as *N.J.S.A.* 30:4D-7(k) directs the DMAHS to seek medical reimbursement from

third parties where appropriate. Moreover, pursuant to *N.J.S.A.* 30:4D-7.1(c), every recipient, as a

condition of eligibility for medical assistance under New Jersey's plan, "is hereby deemed to have

assigned to the commissioner any rights to support for the purpose of medical care as determined

by a court or administrative order and any rights to payment for medical care from any third party."

*N.J.S.A.* 30:4D-7.1(c).

Here, based on the clear state and federal statutory scheme of Medicaid, the DMAHS is

entitled to reimbursement for the payments made on behalf of Jacob and Zipora. As previously

mentioned, Jacob received Medicaid benefits in the amount of $139,064.58, from March 1, 2002

through April 24, 2004, and Zipora received Medicaid benefits in the amount of $180,507.46, from

November 1, 2002 through April 24, 2004. Pl.'s Compl. §§ 22-23. These Medicaid benefits paid

for the care that Jacob and Zipora received while residing at Bergen Medical, a custodial care

facility. *Id*. at ¶¶ 11-12. Importantly, Holtzman's Group Policy, under which Jacob and Zipora

were insured, covered custodial care expenses. *Id*. at ¶¶ 6-7. Indeed, it "provides benefits for care

incurred for an insured while in a convalescent home or custodial care facility in the amount of

$500 per week for up to 156 weeks in a benefit period, with a lifetime maximum of $80,000.00."

*Id.* at ¶ 8. In that regard, Holtzman's Group Policy—not Medicaid, which provides "last resource benefits"—should have paid for the expenses that Jacob and Zipora incurred during their stay at Bergen Medical. *N.J.S.A.* 30:4D-2. Because Holtzman's Group Policy did not provide benefits for Jacob and Zipora prior to Medicaid, Medicaid is entitled to reimbursement from the Group Policy. To hold otherwise would provide Holtzman with a potential windfall, a result that is inconsistent with Medicaid law. *See e.g.*, *Lusby by & ex rel. Nichols v. Hitchner*, 273 N.J. Super. 578, 591 (App. Div. 1994) (holding that "a plaintiff could not in any case pocket a double recovery for medical expenses for the reason that his entire recovery is subject to Medicaid's reimbursement rights.").

Despite the well-established requirements of Medicaid law, Holtzman maintains that the question of whether DMAHS is entitled to reimbursement cannot be resolved on this motion, because there are "numerous issues of material fact in dispute." Holtzman's Opposition to Plaintiff's Motion for Judgment on the Pleadings ("Holtzman's Opposition"), at 3. According to Holtzman, these material issues include, but are not limited to, the following: (1) the validity of DMAHS's claims; (2) the amount of money of the claims; (3) the order or priority of disbursement; (4) the contractual obligation of U.S. Life to Holtzman; (5) the attempt by DMAHS to abrogate Holtzman's contractual rights; and (6) other unspecified issues in dispute. Holtzman's Opposition, at 3-4. Despite these assertions, however, the only factual issue that Holtzman raises relates to the amount of Medicaid's claims. And, the remainder of the issues—which are not supported by any facts whatsoever—concern legal questions that this Court has already addressed.[2]

---

[2]     Holtzman also appears to argue that DMAHS's motion for judgment on the pleadings is untimely. *See* Holtzman's Opposition, at 4. However, this contention is unfounded. Indeed, a party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial . . . . " *See* Fed. R. Civ. P. 12(c). Here, DMAHS's motion was clearly filed after the

First, the validity of DMAH'S claims are supported by the third party liability provisions contained within *N.J.S.A.* 30:4D-7(k). In accordance with that statute, the commissioner is entitled to seek reimbursement, "where it is known that a third party has a liability [to pay for care and services arising out of injury, disease, or disability]." *N.J.S.A.* 30:4D-7(k). This provision has been interpreted by the New Jersey Supreme Court "to afford the State every opportunity to recoup its payments from third parties." *Hedgebeth v. Medford*, 74 N.J. 360, 366 (1977). In the instant matter, Medicaid paid for Jacob and Zipora's custodial care. However, Holtzman's Group Plan, which also insured Jacob and Zipora, was obligated to provide benefits for said medical services. Therefore, DMAHS's recoupment of Medicaid payments from the Group Plan, for the care provided to Jacob and Zipora, is appropriate.

Next, Holtzman challenges "[t]he order and/or priority . . . of disbursements." Without a further explanation by Holtzman, the Court construes this argument to mean that Holtzman's Group Policy was not required to cover Jacob and Zipora's custodial care expenses prior to Medicaid. However, this contention is meritless. Pursuant to the intent of the New Jersey Legislature, the benefits provided under New Jersey's Medicaid plan are specified as "last resource benefits notwithstanding any provisions contained in contracts, wills, agreements or other instruments." *N.J.S.A.* 30:4D-2. Consequently, the Group Policy should have provided Jacob and Zipora with medical assistance before Medicaid provided any state benefits. In fact, if the order of priority as set forth by Medicaid law were not upheld, it would frustrate the intent of the New Jersey Medicaid scheme.

---

pleadings in the case closed, and at a point in the litigation that will not delay trial. Therefore, DMAHS's motion is not barred on timeliness grounds.

Holtzman also argues that U.S. life has a contractual obligation to provide him with payment for Jacob and Zipora's custodial care expenses. However, Holtzman fails to acknowledge that his contractual relationship with U.S. Life must yield to the DMAHS's statutory right to "ascertain the liability of third parties to pay for care arising out of injury or disease and, where appropriate, seek reimbursement to the extent of such liability, 42 *U.S.C.* § 1396a(a)(25)(A)." *Waldman*, 317 N.J. Super. at 471; *N.J.S.A.* 30:4D-7(k). When third party liability does exist, as is the case here, the DMAHS may recover payments made on behalf of a Medicaid recipient by exercising its right of subrogation. Specifically, pursuant to *N.J.S.A.* 30:4D-7.1(c), every recipient of New Jersey's Medicaid program, as a condition of eligibility under the plan, is "deemed to have assigned to the commissioner any rights to support for the purpose of medical care as determined by a court or administrative order and any rights to payment for medical care from any third party." *N.J.S.A.* 30:4D-7.1(c). For this reason, Holtzman's contractual rights are not abrogated by the DMAHS's recoupment of benefits from the Group Policy; rather, the DMAHS is merely exercising the subrogation rights accorded to the commissioner under *N.J.S.A.* 30:4D-7.1(c).

Finally, Holtzman challenges the coverage amount paid by the Group Policy. However, on this motion, this argument is misplaced. I have already determined that DMAHS is entitled to be reimbursed by the Group Policy; therefore, disputes regarding the amount of the coverage under the Group Policy would necessarily be raised by DMAHS—the party entitled to reimbursement— not Holtzman. In that regard, DMAHS does not dispute the remaining amount of the funds, totaling $98,898.38, that were placed in the Court's registry by U.S. Life. Indeed, by filing this motion for judgment on the pleadings, DMAHS has accepted the allegations contained within the Interpleader Complaint as true. Sections 32 and 33 of the Interpleader Complaint provide that, based on the applicable provisions of the Group Policy, $46,929.51 in benefits is due for Jacob

and $62,501.25 in benefits is due for Zipora, for a combined total of $109,430.76. Pl.'s Compl. ¶¶ 32-33. Because $10,532.38 in attorney's fees and costs were awarded to U.S. Life, $98,898.38 remain in the Court's registry. Therefore, the Clerk of the Court is directed to release $98,898.38 of the disputed funds to DMAHS.[3]

## III.   CONCLUSION

For the foregoing reasons, DMAHS's motion for judgment on the pleadings is granted, and Holtzman's request for reconsideration of the Court's April 8 Order is denied.[4] Accordingly, DMAHS is entitled to disputed funds in the amount of $98,898.38, which was deposited into the Court's registry.


Dated: November 15, 2016

/s/ Freda L. Wolfson
Freda L. Wolfson
United States District Judge

---

[3]     Under the applicable Medicaid law, a Medicaid beneficiary is entitled to the amount that remains after a State entity has been reimbursed, by a liable third party, for the medical benefits it provided. *See* 42 *U.S.C.S.* § 1396k(b) (providing that the Medicaid beneficiary shall receive the remainder of any amount collected by the States). In the instant matter, the disputed fund of $98,898.38 does not exceed the amount DMAHS provided in medical assistance payments for Jacob and Zipora. *See* Pl.'s Compl.¶¶ 32-33. Therefore, after DMAHS is reimbursed, no funds will remain in the Court's registry to distribute to Holtzman.

[4]     The Court, to avoid repetition, will not reiterate its analysis with regard to the denial of Holtzman's request for reconsideration in this Opinion. Instead, for an explanation as to why the request for reconsideration is denied, the Court directs Holtzman's attention to its previous Letter Order entered on May 5, 2016.